UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

BRIAN B. JAEGERS,

                                         Plaintiff,

v.                                                                    6:02-CV-1491
                                                                       (NAM/GHL)

COMMISSIONER OF SOCIAL SECURITY,

                                                  Defendant.

_____

APPEARANCES:                                        OF COUNSEL:

OFFICE OF PETER W. ANTONOWICZ            PETER W. ANTONOWICZ, ESQ.
*Counsel for Plaintiff*
1300 Floyd Avenue
Rome, New York 13440-4600

HON. GLENN T. SUDDABY                        WILLIAM H. PEASE, ESQ.
United States Attorney for the                      Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION[1]

## I.        BACKGROUND

### A.       Procedural History

Plaintiff's mother, on his behalf, filed an application for supplemental security income

benefits ("SSI") on February 2, 2000.  (Administrative Transcript ("T") at 40, 68-71.)  The

_____

[1]  This matter was referred to me for report and recommendation by the Honorable Norman A.
Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York
Local Rule 72.3.

application was denied initially and upon reconsideration. (T. at 41-44, 46-49.) Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ") which was held on May 3,

2001. (T. at 21-38.) On June 28, 2001, the ALJ issued an unfavorable decision finding that

Plaintiff was not disabled. (T. at 13-16.)

Plaintiff appealed to the Appeals Council and the ALJ's decision became the final

decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on

November 5, 2002. (T. at 3-5.) Plaintiff commenced this action on November 27, 2002. (Dkt.

No. 1.)

### B.    The Contentions

Plaintiff makes the following claims:

(1)    Whether the Secretary's decision is supported by substantial evidence. (Dkt. No. 7

at 5-10.)

(2)    Whether the Secretary failed to properly develop the record. (Dkt. No. 7 at 11-

12.)

Defendant contends that the ALJ's decision is supported by substantial evidence and

therefore should be affirmed. Dkt. No. 8.

## II.    APPLICABLE LAW

### A.    Standard for Benefits

Congress amended the definition of childhood disability in 1996. *See* PRWORA,[2] Pub.

L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. § 1382c). Prior to

---

[2] Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub.
L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. § 1382c).

1996, a child was entitled to SSI disability benefits if he or she suffered from a "medically determinable physical or mental impairment of comparable severity" to that which would disable an adult.  *See* 42 U.S.C. § 1382c(a)(3)(A) (2004).

The PRWORA replaced this "comparable severity" standard with one that focuses on whether a child has "marked and severe" limitations.  42 U.S.C. § 1382c (2004).  This new standard involves a three-step analysis.  20 C.F.R. § 416.924(a) (2005).  The first question is whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b) (2005).  If not, then the second inquiry is whether the child has a severe impairment.  20 C.F.R. § 416.924(c) (2005).  A "severe" impairment is one that is more than a "slight abnormality."  *Id.*  If the child's impairment is severe, then the third question is whether the impairment meets or is medically or functionally equal in severity to a disability listed in the Listing of Impairments (the "Listings")*.  See* 20 C.F.R. § 416.924(d) (citing 20 C.F.R. Part 404, Subpt. P, App. 1).  If all three of the above requirements are met, and the child's disability has met the twelve month durational requirement,[3] then the child will be considered disabled.  20 C.F.R. § 416.924(d) (2005).

The final decision in this case was rendered on November 5, 2002, when the Appeals Council denied review.  (T. at 4-5.)  After the PRWORA was enacted, interim final rules were published on February 11, 1997.  62 Fed. Reg. 6408 (Feb. 11, 1997).  Revised final rules ("Final Rules") went into effect on January 2, 2001.  65 Fed. Reg. 54,747 (Sept. 11, 2000) (to be codified at 20 C.F.R. §§ 404, 416).  The preamble to the Final Rules specifically explained their effective date.  65 Fed. Reg. 54,747, 54,751.  "With respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review

---

[3]  20 C.F.R. §§ 416.909, 416.924(d)(1) (2005).

of the Commissioner's final decision would be made in accordance with the rules in effect at the time of the final decision."  65 Fed. Reg. at 54,751; *see also Ruiz v. Barnhart*, Civ. No. 01-1120, 2002 WL 826812, at *5 (S.D.N.Y. Apr. 30, 2002) (quoting 65 Fed. Reg. at 54,751)).  Because the final decision in this action was rendered when the Final Rules were in effect, this Court must apply the Final Rules to Plaintiff's case.

Under the Final Rules, an impairment "meets" the severity of a listed impairment if the "medical findings are at least equal in severity and duration to the listed findings."  20 C.F.R. § 416.926(a) (2005).  If the impairment is not listed or medically equivalent to a listed impairment, then "functional equivalence" must be examined.  An impairment is "functionally equivalent" if the impairment(s) are of listing-level severity.  20 C.F.R. § 416.926a(a) (2005).  An impairment meets listing-level severity if the impairment results in "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ."  *Id.*  The six domains considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) the child's ability to care for him/herself; and (6) health and physical well-being.  20 C.F.R. §§ 416.926a(b)(1)(i) – (vi) (2005).

The regulations state that a child has a "marked" limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to "independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i) (2005).  A "marked" limitation is also described by the regulations as more than moderate but less than extreme.  *Id.*  A finding of an "extreme" limitation is warranted when the child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain, or complete activities.  20 C.F.R. §

416.926a(e)(3)(i) (2005).  An "extreme" limitation is also described by the regulations as "more than marked" and the rating "given to the worst limitations."  *Id.*  However, although a rating of "extreme" may be given, it does not necessarily mean a total lack or loss of ability to function. *Id.*

### B.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Brown v. Barnhart*, Civ. No. 02-4523, 2003 WL 1888727, at *4 (S.D.N.Y. Apr. 15, 2003); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2005); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

5

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  "To determine on appeal whether an

ALJ's findings are supported by substantial evidence, a reviewing court considers the whole

record, examining the evidence from both sides, because an analysis of the substantiality of the

evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258.

However, a reviewing court cannot substitute its interpretation of the administrative record for

that of the Commissioner if the record contains substantial support for the ALJ's decision.

*Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685

F.2d 60, 62 (2d Cir. 1982).

**III.     THE PLAINTIFF**

     Plaintiff was born on April 10, 1986.  (T. at 68.)  He alleges disability due to, *inter alia*,

cerebral palsy, eczema, a speech impediment, and depression.  (Dkt. No. 7 at 3.)

**IV.     THE ALJ'S DECISION**

     The ALJ found that: (1) Plaintiff had never engaged in substantial gainful activity (T. at

16); (2) Plaintiff suffered from mild cerebral palsy, speech and language delays, and skin

problems which were severe (*Id.*); and (3) although the impairments were severe, they did not

meet, equal, or functionally equal the criteria of any listed impairment.  (*Id.*)

**V.     DISCUSSION**

     **A.     Whether the Secretary's Decision is Supported by Substantial Evidence**

     Plaintiff argues that the Secretary's denial of Plaintiff's claim is not supported by

substantial evidence because his impairments result in limitations that functionally equal listed

impairments.[4]  (Dkt. No. 7 at 6.)

In order to determine functional equivalence, "your impairment(s) must be of listing-level severity; *i.e.*, it must result in 'marked' limitations in two or more domains of functioning or an 'extreme' limitation in one domain . . . ."  20 C.F.R. § 416.926a(a) (2005).  The six domains considered are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  20 C.F.R. §§ 416.926a(b)(1)(i) – (vi).

Plaintiff argues that because he has marked limitations in two domains, *i.e.*, (1) moving about and manipulating objects and (2) interacting and relating with others, his impairments are functionally equivalent to a listed impairment.  (Dkt. No. 7 at 6-10.)  The ALJ found that Plaintiff had some limitations of function in the domains of interacting and relating with others, moving about and manipulating objects, and acquiring and using information,[5] but that none of these limitations rose to the marked or extreme levels.  (T. at 15.)

### 1.    Moving About and Manipulating Objects

"In this domain, we consider how you move your body from one place to another and how you move and manipulate things.  These are called gross and fine motor skills."  20 C.F.R. § 416.926a(j) (2005).  The Regulations state that for adolescents (age twelve to the attainment of age eighteen), the child should be able to:

> use your motor skills freely and easily to get about your school, the

---

[4]  Plaintiff concedes that his impairments do not meet or equal any listed impairments.  (Dkt. No. 7 at 6.)

[5]  Plaintiff does not argue that he has a marked or extreme limitation in this domain.  (Dkt. No. 7 at 5-10.)

> neighborhood, and the community.  You should be able to
> participate in a full range of individual and group physical fitness
> activities.  You should show mature skills in activities requiring
> eye-hand coordination, and should have the fine motor skills
> needed to write efficiently or type on a keyboard.

20 C.F.R. § 416.926a(j)(2)(v) (2005).  The Regulations also set forth examples of limited

functioning in this domain:[6]

> (i)      You experience muscle weakness, joint stiffness, or sensory
> loss (e.g., spasticity, hypotonia, neuropathy, or paresthesia)
> that interferes with your motor activities (e.g., you
> unintentionally drop things).
>
> (ii)     You have trouble climbing up and down stairs, or have
> jerky or disorganized locomotion or difficulty with your
> balance.
>
> (iii)    You have difficulty coordinating gross motor movements
> (e.g., bending, kneeling, crawling,  running, jumping rope,
> or riding a bike).
>
> (iv)     You have difficulty with sequencing hand or finger
> movements.
>
> (v)      You have difficulty with fine motor movement (e.g.,
> gripping or grasping objects).
>
> (vi)     You have poor eye-hand coordination when using a pencil
> or scissors.

20 C.F.R. §§ 416.926a(j)(3)(i) – (vi) (2005).

Plaintiff argues that he has marked limitations in this domain because, as a result of his

cerebral palsy, his lower extremities are affected causing difficulties in his ability to walk, run,

and perform typical teenager activities.  (Dkt. No. 7 at 8.)  Furthermore, Plaintiff alleges that he

cannot play sports consistent with the level typically enjoyed by other children his age, and that

he is clumsy and awkward, falls down, and can only ambulate slowly.  (*Id.*)

The medical evidence contained in the record clearly evidences that Plaintiff has some

---

[6]  The Regulations specifically state that these examples do not necessarily describe marked or
extreme limitations.  20 C.F.R. § 416.926a(j)(3) (2005).

limitations as a result of his cerebral palsy.  However, the Court agrees with the ALJ's finding that Plaintiff's limitations do not functionally equal any listed impairment.  The medical evidence provides substantial support for the ALJ's finding.  For example, on April 15, 1999, Plaintiff was examined by Andrew C. Zaleski, M.D.  (T. at 118-119.)  Dr. Zaleski found that Plaintiff had good range of motion in his hips and found no sensory or motor loss in his lower extremities.  (T. at 118.)   Additionally, Plaintiff had full range of motion in his upper extremities and had no restriction of coordination.  (*Id.*)

Pablito S. DelaCruz, M.D. consultatively examined Plaintiff on June 15, 1999.  (T. at 121-123.)  Dr. DelaCruz's impression was that Plaintiff had mild cerebral palsy of the spastic diplegia type and specifically noted that Plaintiff's symptoms were **not** progressing.  (T. at 122.)  He recommended that no further tests or evaluations be performed because of the non-progressive nature of the symptoms.  (T. at 123.)  Furthermore, Dr. DelaCruz noted that "[i]f at all, the symptoms have actually improved over the years with various consultations from different doctors." (*Id.*)

During a disability evaluation by Khalid Ahmed, M.D. on May 2, 2000, Plaintiff's mother provided the medical history and stated that Plaintiff was "not a good athlete although he used to played basketball and soccer last year." (T. at 144.)  Dr. Ahmed's diagnosis was that Plaintiff had mild cerebral palsy and spastic diplegia, slight speech delay, and eczema, which was under "good control" under his current treatment.  (T. at 146.)

A non-examining SSA physician completed a Childhood Disability Evaluation Form on May 19, 2000 and found that Plaintiff had severe impairments, but that none met, medically equaled, or functionally equaled the severity of a listing.  (T. at 150.)  The physician opined that

Plaintiff had a *less than marked degree* of limitation in his cognitive/communicative, motor, and social functions, and that there was *no evidence of limitation* in Plaintiff's personal function or regarding his concentration, persistence, or pace. (T. at 152.)  In another Childhood Disability Evaluation Form completed by another non-examining SSA physician on August 3, 2000, that physician also found that Plaintiff had severe impairments, but that none met, medically equaled, or functionally equaled the severity of a listing.  (T. at 158.)  The physician opined that Plaintiff had a *less than marked degree* of limitation with regard to his cognitive/communicative and motor skills, and that Plaintiff had *no evidence of limitation* with regard to personal function or his concentration, persistence or pace.  (T. at 160.)

On April 26, 1999, an MRI was taken of Plaintiff's lumbosacral spine.  (T. at 242.)  According to Michael Fries, M.D., there were no significant findings and there was no disc disease or developmental abnormalities.  (*Id.*)  An MRI of Plaintiff's cervical spine was performed on December 1, 2001.  (T. at 231.)  Andrew N. Sternick, M.D. stated that "[t]here is no evidence for [sic] herniated or significant bulging disc.  There is no evidence for [sic] spinal stenosis or destructive abnormality.  The spinal cord appears normal in size, shape and position. The neural foramina appear unremarkable."  (T. at 231.)

On December 1, 1999, the Rome City School District performed an evaluation of Plaintiff to determine whether his educational placement was appropriate.  (T. at 136-140.)  The evaluation noted that Plaintiff had been recently diagnosed with cerebral palsy and was allowed extra time to pass between classes, but that the family was "not receiving any services for the Cerebral Palsy diagnosis at this time."  (T. at 138.)  The Rome City School District Report on Performance for Plaintiff's 2000 to 2001 school year noted that with regard to Plaintiff's physical

10

development, Plaintiff was alert, participated in physical education, and exhibited no physical

limitations that adversely affected his academic performance.  (T. at 194.)  Plaintiff also reported

that he enjoyed basketball.  (T. at 195.)

On December 18, 2001, Plaintiff complained to Dr. DelaCruz of significant back pain.

(T. at 230.)  Dr. DelaCruz noted the normal results of Plaintiff's cervical MRI and upon

reviewing his history, "it appears that Brian has been over-exercising and has been doing

weightlifting daily.  He squats 60 lb 50 times a day, does a 100 [sic] sit-ups, 30 push-ups, 20

butterflies and bench presses."  (*Id.*)  Upon examination, there was no deformity of the back,

which was well aligned, and there was no swelling of the lumbar area.  (*Id.*)  Dr. DelaCruz's

impression was low back strain.  At a January 18, 2002 follow-up appointment regarding

Plaintiff's low back pain, Dr. DelaCruz noted that Plaintiff had "discontinued certain behavior

that predisposes him to further back pain, including lifting weights, probably in an improper

manner."  (T. at 228.)

Plaintiff received physical therapy from Chestnut Commons Physical Therapy and

Rehabilitation Center in February and March of 2002.  (T. at 205-211.)  At his initial evaluation

on February 5, 2002, Michael T. Haley, P.T., noted that "[t]he patient's sitting posture is

atrocious, he sits in a super sloucher, and in this position he has back pain.  **With posture**

**correction his complaints abolish**."  (T. at 210, emphasis added.)  On February 15, 2002, Mr.

Haley noted that Plaintiff was only performing his extension exercises twice daily; Plaintiff was

told to increase the repetitions to ten times every two to three hours.  (T. at 209.)  Mr. Haley also

noted that Plaintiff was not complying with the recommended postural correction; Plaintiff was

sitting in "a very exaggerated slouch today."  (*Id.*)

11

At Plaintiff's February 21, 2002 session, Plaintiff continued to be noncompliant with the correction of his posture.  (T. at 208.)  Mr. Haley noted that with posture correction and performance of the extension exercises, Plaintiff's complaints of low back pain were resolved. (*Id.*)  Plaintiff's complaints of back pain at his March 1, 2002 appointment were again "abolished once he performed extensions in lying and his posture was corrected."  (T. at 206.)  Mr. Haley specifically noted that although Plaintiff complained that ambulation at school provoked his pain, "it is not the ambulation at school that provokes his pain, it is the patient's sitting posture, for once the patient was placed in sitting in the slouched position his complaints occurred within one and a half minutes."  (*Id.*)  Mr. Haley stated that "[u]nfortunately, if the patient cannot correct his posture his complaints of back pain will not resolve.  This has been emphasized repeatedly." (*Id.*)  At Plaintiff's March 15, 2002 appointment, it was noted that Plaintiff was only performing his extension in lying exercises three times daily, however Mr. Haley had encouraged Plaintiff to perform these exercises at least six times daily.  (T. at 205.)

The above medical evidence does not support Plaintiff's argument that his impairments are marked ones, meaning that they seriously interfere with his ability to independently initiate, sustain, or complete activities.  In fact, there is substantial evidence to support the ALJ's finding that Plaintiff's impairments did not meet, medically equal, or functionally equal a listed impairment.

Plaintiff had no sensory or motor loss in his lower extremities (T. at 118) and his symptoms were "non-progressive" and may have actually improved over the years (T. at 123.) Plaintiff played and enjoyed basketball and soccer (T. at 144, 195) and MRIs taken of Plaintiff's spine were normal (T. at 231, 242).  Plaintiff's physical therapist noted that the back pain was due

to Plaintiff's "atrocious" posture and that upon correcting his posture, Plaintiff no longer

complained of back pain.  (T. at 210.)  Notably, two SSA physicians found that Plaintiff had

severe impairments, but that none met, medically equaled, or functionally equaled the severity of

a listing.  (T. at 150, 158.)  There is substantial evidence to support the ALJ's finding that

Plaintiff's impairments do not functionally equal the criteria of any listed impairments.

### 2.   Interacting and Relating with Others

"In this domain, we consider how well you initiate and sustain emotional connections

with others, develop and use the language of your community, cooperate with others, comply

with rules, respond to criticism, and respect and take care of the possessions of others."  20

C.F.R. § 416.926a(i) (2005).  The Regulations state that for adolescents (age twelve to the

attainment of age eighteen), the child should be able to:

> initiate and develop friendships with children who are your age and
> to relate appropriately to other children and adults, both
> individually and in groups.  You should begin to be able to solve
> conflicts between yourself and peers or family members or adults
> outside your family.  You should recognize that there are different
> social rules for you and your friends and for acquaintances or
> adults.  You should be able to intelligibly express your feelings,
> ask for assistance in getting your needs met, seek information,
> describe events, and tell stories, in all kinds of environments (e.g.,
> home, classroom, sports, extra-curricular activities, or part-time
> job), and with all types of people (e.g., parents, siblings, friends,
> classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v) (2005).  The Regulations also set forth examples of limited

functioning in this domain:[7]

> (i)   You do not reach out to be picked up and held by your

_____

[7]  As stated above, the Regulations specifically state that these examples do not necessarily
describe marked or extreme limitations.  20 C.F.R. § 416.926a(i)(3) (2005).

13

caregiver.
(ii)     You have no close friends, or your friends are all older or younger than you.
(iii)    You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
(iv)     You have difficulty playing games or sports with rules.
(v)      You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.
(vi)     You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. §§ 416.926a(i)(3)(i) – (vi) (2005).

Plaintiff argues that he has marked limitations in this domain because he is difficult to understand as a result of his speech impediment.  (Dkt. No. 7 at 8.)  Furthermore, Plaintiff contends that his eczema, which causes pain, itching, and irritation, magnifies his discomfort around people.  (Dkt. No. 7 at 9.)

The Court agrees with the ALJ's finding that while Plaintiff has severe impairments which cause some limitation of function, these impairments do not meet, equal, or functionally equal any listed impairment.  (T. at 15.)  The medical evidence provides substantial support for the ALJ's finding.  For example, during Dr. DelaCruz's June 15, 1999 consultation, Plaintiff's parents reported that the evaluation of his IQ was "normal."  (T. at 121.)  Furthermore, pursuant to the Rome City School District Report on Performance for Plaintiff's 1999 to 2000 school year, Plaintiff's aptitude was rated "ability appropriate"[8] except in the areas of speech articulation and intelligibility, which were rated "developing."  (T. at 130-131.)

_____

[8] These areas included pre-academic skills, language receptiveness and expression, reading, written communication, mathematics, and social development.  (T. at 130-131.)

14

The Rome City School District's December 1, 1999 evaluation to determine the appropriateness of Plaintiff's educational placement noted that Plaintiff's report card reflected an 87 for behavior and conduct.[9]  (T. at 136-140.)  Regarding Plaintiff's speech and language, the evaluator noted that "[p]ast grades indicate average abilities as he passed all subjects with a cumulative average of 82.4. . . .  According to his teachers, he does not hesitate to speak in class even though he is often hard to understand." (T. at 138.)  The speech and language evaluator noted Plaintiff's articulation delay and further stated that his "decreased intelligibility has not appeared to impact social relationships or academics."  (T. at 139.)  Pursuant to the evaluation, the Committee on Special Education recommended that Plaintiff continue to be recognized as a non-disabled student and receive regular education services.  (T. at 140.)

Frank V. DeLaus, M.D. treated Plaintiff for a rash on his buttocks on December 21, 1999. (T. at 177.)  Plaintiff was diagnosed with eczema and was given some ointments.  (*Id.*)  At a follow-up appointment on February 1, 2000, Plaintiff was seen by Cathryn Barnes, RNMSANP. Ms. Barnes noted her concern over Plaintiff's failure to comply with the prescribed treatment and Plaintiff's mother's understanding of his condition.[10]  At Plaintiff's March 20, 2000 appointment,

---

[9]  At the time of the evaluation, Plaintiff was thirteen years old and in the seventh grade.  (T. at 137.)

[10]  Ms. Barnes noted that her "generalized impression is that this child is not following the treatment plan as it has been spelled out.  Mother seems to have many misconceptions about the care of the skin and misconceptions about the nature of Eczema . . . .  He should not be taking baths, he should be taking showers.  There should be no scraping or peeling of the skin . . . .  Very explicit instructions were written for this mother and it was explained to her at length.  I do not have a high confidence level that this mother will follow through with this treatment plan.  I did reinforce that some of her ideas about treating him would harm the child." (T. at 178.)  At the appointment, Plaintiff's mother stated that "perhaps [Plaintiff's] situation would improve . . . if she used a knife or a razor blade and scraped all of the rash off."  (T. at 177.)

the notes reflect doubt as to whether Plaintiff was complying with the treatment.  (*See* T. at 155.)

("I'm not so convinced that this [patient] is treating himself like he should . . .  I don't know how

religiously this [patient] is treating himself.")

At Plaintiff's April 17, 2000 appointment, upon compliance with the prescribed treatment

and taking his medication, Plaintiff was markedly improved and doing very well.  (T. at 155.)

On July 10, 2000, Dr. DeLaus wrote "I see no evidence of permanent disability in this patient.

Diagnosis is eczema."  (T. at 154.)  On March 19, 2001, Plaintiff was doing fairly well, however,

it was also noted that Plaintiff "was taking 3 baths a day, absolutely must stop that, one a day and

he must use Vaseline qd after bathing."  (T. at 170.)

Plaintiff was examined by Carrie Dentino, CLSWII, a social worker, on November 10,

2000.  (T. at 167.)  She diagnosed him with an adjustment disorder with depressed mood and

recommended a psychiatric evaluation.  (*Id.*)  However, as of March 28, 2001 (the date of Ms.

Dentino's letter), Plaintiff had not yet participated in a psychiatric assessment.  (*Id.*)  Ms.

Dentino's assessment of Plaintiff noted that he was pleasant and cooperative, had age appropriate

behavior with unclear speech, had normal thought process and content, and average intellectual

functioning, judgment, and insight.  (T. at 180.)

The Rome City School District Report on Performance for Plaintiff's 2000 to 2001 school

year noted that his teachers "have made very positive statements about Brian's achievement

abilities" and that Plaintiff enjoyed academic success.  (T. at 193.)  However, it was also noted

that Plaintiff needed to reduce tardiness, increase homework completion in some areas, and try to

put forth consistent effort.  (*Id.*)  The report also stated that Plaintiff was polite, pleasant,

respectful, cooperative, and got along with his teachers and peers with "occasional social

conflicts typical of a boy his age." (T. at 193-194.)  The Committee on Special Education determined that Plaintiff did not have an educational disability. (T. at 197.)

The above evidence does not support Plaintiff's argument that his impairments seriously interfere with his ability to independently initiate, sustain, or complete activities. In fact, there is substantial evidence to support the ALJ's finding that while Plaintiff had some limitations of function in the areas of interacting and relating with others, these limitations did not rise to the level of marked or extreme. (T. at 15.) Although Plaintiff's speech impediment is documented in the medical evidence, a speech and language evaluator for the Rome City School District stated that Plaintiff's "decreased intelligibility has not appeared to impact social relationships or academics." (T. at 139.) The Rome City School District Report on Performance for Plaintiff's 2000 to 2001 school year stated that Plaintiff enjoyed academic success, was polite, pleasant, respectful, cooperative, and got along with his teachers and peers with "occasional social conflicts typical of a boy his age." (T. at 192-194.) With regard to Plaintiff's eczema, with proper compliance with the treatment prescribed, Plaintiff was "markedly improved" and doing well. (T. at 155, 170.) Dr. DeLaus also stated that he saw "no evidence of permanent disability in this patient." (T. at 154.) There is substantial evidence to support the ALJ's finding that Plaintiff impairments do not functionally equal the criteria of any listed impairments.

**B.      Whether the Secretary Failed to Properly Develop the Record**

"It is the rule in [the Second C]ircuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,' even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) and *Echevarria v.*

*Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  "[T]he record must

be sufficiently complete to 'make a determination . . . about whether [plaintiff is] disabled . . . '"

*Youney v. Barnhart*, 280 F. Supp. 2d 52, 62 (W.D.N.Y. 2003) (quoting 20 C.F.R. §§

404.1512(e), 416.912(e)).  The ALJ has the duty to develop the record and seek out further

information where physicians' reports are inconsistent and where gaps exist in the record.

*Peterson v. Barnhart*, 219 F. Supp. 2d 491, 494-95 (S.D.N.Y. 2002) (citing *Rosa v. Callahan*,

168 F.3d 72, 79 n.5 (2d Cir. 1999) and *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996)).  However,

where the ALJ has a "'complete medical history,' the ALJ is under no duty to seek additional

information before rejecting a claim."  *Peterson*, 219 F. Supp. 2d at 495 (citing *Rosa*, 168 F.3d at

79 n.5 and *Perez*, 77 F.3d at 48); *see also Youney*, 280 F. Supp. 2d at 62 (the Commissioner

"need not develop the record in areas where there is absolutely no credible evidence, medical or

otherwise, that such development is necessary") (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d

Cir. 1998); and *Perez*, 77 F.3d at 48 (" The ALJ had before him a complete medical history, and

the evidence received from the treating physicians was adequate for him to make a determination

as to disability.").

Plaintiff argues that "it is not the province of the Judges to make medical determinations"

and "[i]n this case, the Judge did make medical determinations regarding the Plaintiff's

psychiatric condition by failing to even address a well documented impairment.[11]  The Judge

failed to send the Plaintiff for a consultative psychological evaluation or to contact any treating

---

[11]  In the previous section of Plaintiff's brief regarding functional equivalence, he stated "[t]he
administrative law judge failed to even mention the plaintiff's psychological impairments, and failed to
develop the record with regard to these impairments."  (Dkt. No. 7 at 8.)  Because this point is related, it
will be addressed with Plaintiff's duty to develop the record argument.

physician for an explanation of the limitations that may be associated with the plaintiff's emotional difficulties."  (Dkt. No. 7 at 11.)

Because this argument is so conclusory, the Court must guess as to its meaning.  Our guess is that Plaintiff is arguing that the ALJ's failure to mention Plaintiff's psychiatric condition in his Decision constitutes a "medical determination."

In fact, as is discussed below in Point V.C.1., the only evidence of Plaintiff's psychiatric condition that was submitted to the ALJ was limited, *i.e.*, a social worker's diagnosis  of adjustment disorder with depressed mood.  (T. at 167.)  More complete evidence, *i.e.*, assessments and progress notes by a psychiatrist, were submitted to the Appeals Council.  (T. at 215-217, 219-224.)  This evidence was considered by the Appeals Council (T. at 3-5), which "concluded that this evidence does not provide a basis for changing the Administrative Law Judge's decision"  (T. at 3.)  As is discussed below in Point V.C.2., there is substantial evidence supporting this conclusion by the Appeals Council.

In short, the fact that the ALJ did not mention Plaintiff's psychiatric condition is irrelevant, since it was considered by the Appeals Council.

Plaintiff further contends that the ALJ was "doubtful as to the severity of the Plaintiff [sic] conditions, and the appropriate course for the Judge was to order a consultative examination . . . .  The Judge is not allowed to rely on his own lay impressions, and must endeavor to develop an adequate record from which he can draw a reasonable conclusion."  (Dkt. No. 7 at 12.)

From this Court's review of the ALJ's decision, there is no doubt as to his finding regarding the severity of Plaintiff's impairments.  Furthermore, pursuant to 20 C.F.R. § 404.1517, the SSA "may ask [a claimant] to have one or more physical or mental examinations or tests" **if**

19

the claimant's "medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled . . . ." 20 C.F.R. §§ 404.1517, 416.917 (2005). The sections of the Code of Federal Regulations are very clear that **if** gaps or inconsistencies exist, the ALJ must further develop the record by recontacting medical sources and/or obtaining consultative examinations. 20 C.F.R. §§ 404.1512, 404.1517, 416.912, 416.917 (2005). Here, the medical evidence with respect to Plaintiff's impairments, as is discussed above at Point V.A., was sufficient for the Secretary to determine Plaintiff's condition. Thus, further development of the record was not warranted.

### C.    The Evidence Submitted to the Appeals Council

Plaintiff submitted certain evidence to the Appeals Council after the ALJ rendered his decision. (T. at 201-242.) Although Plaintiff cites to some of this evidence in his "Statement of Facts," his argument regarding this evidence is limited to one conclusory sentence: "[l]ikewise, the Appeals Council failed to accord any weight to the psychological limitations found by Dr. Cephas and other treating sources."[12] (Dkt. No. 7 at 9.) Defendant argues that the new evidence submitted to the Appeals Council does not provide a basis for changing the ALJ's decision. (Dkt. No. 8 at 16.) Furthermore, Defendant contends that most of the evidence post-dates the ALJ's decision and is thus not material. (*Id.*) The Appeals Council considered the additional evidence,

---

[12] "Treating source" is defined as a claimant's own physician, psychologist, or other acceptable medical source who provides the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902 (2005). The regulation goes on to state, "[g]enerally we will consider that you [the claimant] have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.* The only "treating source" who opined about Plaintiff's alleged psychological impairments was Dr. Cephas. (*See* T. at 201-242.) Thus, it is unclear what "other treating sources" Plaintiff is referring to.

"but concluded that this evidence does not provide a basis for changing the Administrative Law Judge's decision."  (T. at 3.)

        1.    <u>Materiality of the Evidence</u>

20 C.F.R. § 416.1470(b) and 416.1476(b) state:

> In reviewing decisions based on an application for benefits, the Appeals Council will consider the evidence in the administrative law judge hearing record and any new and material evidence only if it relates to the period on or before the date of the administrative law judge hearing decision.  If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application.

20 C.F.R. §§ 416.1470(b), 416.1476(b) (2005).  The new evidence submitted to the Appeals Council becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.  *Perez*, 77 F.3d at 45.  Thus, "[w]hen the Appeals Council denies review after considering new evidence, [the Court] simply review[s] the entire administrative record, which includes the new evidence, and determine[s], as in every case, whether there is substantial evidence to support the decision of the Secretary."  *Id.* at 46.

Given the above, to the extent that Defendant argues that most of the evidence submitted to the Appeals Council post-dates the relevant period[13] and is thus not material, the argument is unpersuasive.  Here, the evidence which was submitted to the Appeals Council regarding Plaintiff's alleged psychological impairments does relate to the period before the ALJ's decision.

---

[13]  By relevant time period, the Court assumes Defendant refers to the period on or before the ALJ's decision, as set forth by 20 C.F.R. §§ 416.1470(b), 416.1476(b), which is also referred to by Defendant in the sentence preceding this argument.

In *Lisa v. Secretary of the Dep't of Health and Human Servs.*, the Second Circuit held:

> We have observed, repeatedly, that evidence bearing upon an
> applicant's condition subsequent to the date upon which the earning
> requirement [*i.e.*, insured status] was last met is pertinent evidence
> in that it may disclose the severity and continuity of impairments
> existing before the earning requirement date or may identify
> additional impairments which could reasonably be presumed to
> have been present and to have imposed limitations as of the
> earning requirement date.

*Lisa v. Secretary of the Dep't of Health and Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991)

(internal quotation marks and citations omitted).  *See also Boyd v. Apfel*, Civ. No. 97-7273, 1999

WL 1129055, at *5 (E.D.N.Y. Oct. 15, 1999) ("As the opinion of plaintiff's primary treating

physician that plaintiff is disabled, this letter [submitted to the Appeals Council] is clearly

material.  It also relates to the relevant period: while the letter summarizes an examination that

occurred after the administrative hearing, it concerns Dr. Weston's treatment of an ongoing

medical condition.") and *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 119 n.1 (2d Cir.

1998) ("[T]he new test results were found to be material because they not only shed light on the

claimant's current health, but also provided an explanation for her health problems in the time

period for which benefits were denied.").

In this case, there was evidence of Plaintiff's depression, which was contained in the

administrative transcript considered by the ALJ.  (T. at 167.)  On November 10, 2000, Ms.

Dentino, a social worker, diagnosed Plaintiff with an adjustment disorder with depressed mood.

(*Id.*)  The evidence submitted to the Appeals Council, *i.e.*, the psychiatric assessment and

psychiatric progress notes by Dr. Marcellus Cephas, Staff Psychiatrist, also regard Plaintiff's

depression.  Furthermore, Dr. Cephas's May 29, 2001 psychiatric assessment of Plaintiff pre-

dates the ALJ's decision, although it was not part of the administrative transcript considered by

the ALJ.  (T. at 215-217.)  Thus the Court rejects Defendant's argument that most of the evidence

submitted to the Appeals Council is not material because it post-dates the relevant period.

                    2.    Weight of the Evidence

        As previously noted, Plaintiff makes a one sentence conclusory argument that "the

Appeals Council failed to accord any weight" to the evidence submitted to it.  Plaintiff is wrong;

the Appeals Council considered this evidence but concluded that it was not sufficient "to provide

a basis for changing the Administrative Law Judge's decision." (T. at 3.)  This Court agrees.  The

psychiatric assessment and psychiatric progress notes by Dr. Cephas are consistent with the ALJ's

finding that Plaintiff's impairments, while severe, do not meet, equal, or functionally equal a

listed impairment.

        In his May 29, 2001 psychiatric assessment, Dr. Cephas described Plaintiff as calm,

cooperative, pleasant, quite sad in effect, goal directed, and coherent.  (T. at 216.)  Cognitively,

he described Plaintiff as intact and further stated that his memory, insight, and judgment were

fair.  (*Id.*)  Dr. Cephas diagnosed Plaintiff with "depression, NOS," "general anxiety d/o," and

"R/O PTSD."  (*Id.*)  He prescribed Zoloft,[14] recommended individual and family therapy, and that

Plaintiff change schools.

        In a July 10, 2001 psychiatric progress note, Dr. Cephas stated that Plaintiff was doing

well on the medication, but continued to have some difficulty with his behavior and adjustment.

(T. at 219.)  The dosage of Zoloft was increased.  (*Id.*)  On August 8, 2001, Plaintiff was doing

---

[14]  Zoloft is a medication used to treat depression.  THE PDR POCKET GUIDE TO PRESCRIPTION
DRUGS 1403 (3d ed. 1998).

well on the increased dosage of the medication.  (T. at 220.)  "His mood has improved; he has been much more amenable as well as less agitated.  He is cooperative and pleasant." (*Id.*) Because he was teased "quite a bit," Plaintiff's mother mentioned taking him out of school, and Dr. Cephas noted his support.  (*Id.*)  By the October 2, 2001 appointment, Plaintiff's mother had taken him out of school.  (T. at 221.)

On November 6, 2001, Dr. Cephas noted that Plaintiff was doing well on his medication and that he had transferred to another school.  (T. at 222.)  There were no complaints regarding his behavior; Plaintiff was calm, pleasant, and cooperative.  (*Id.*)  In his December 4, 2001 psychiatric progress note, Dr. Cephas again commented that Plaintiff was doing well and not having any difficulties.  (T. at 223.)  On February 20, 2002, Dr. Cephas observed that Plaintiff continued to be doing well on his medication, was calm, pleasant, not tearful, and not fighting in school.  (T. at 224.)

Thus there is substantial evidence that the Appeals Council properly found that the new evidence submitted to it provided no basis for changing the ALJ's decision.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED**  and the complaint (Dkt. No. 1) be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72, 6(a), 6(e).

Dated: March 2, 2006
   Syracuse, New York

             George H. Lowe
            United States Magistrate Judge